IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SPRINGBROOK SOFTWARE, INC.,

                                      Plaintiff,                    OPINION AND ORDER

     v.

                                                        13-cv-760-slc

DOUGLAS COUNTY and CITY of SUPERIOR,

                                        Defendants.

---

In this civil action for damages, Springbrook Software, Inc. has sued Douglas County and the City of Superior for breach of contract, breach of good faith and fair dealing, unjust enrichment and quantum meruit after defendants stopped paying fees owed under an agreement for the purchase of Springbrook's financial system software. Douglas County and the City of Superior have counterclaimed, asserting causes of action for misrepresentation, fraudulent inducement, false advertising, breach of the covenant of good faith and fair dealing and unjust enrichment. Diversity jurisdiction is present under 28 U.S.C. § 1332.

Before the court is Springbrook's motion for summary judgment, dkt. 50. Springbrook seeks judgment dismissing defendants' counterclaims in their entirety, as well as judgment in its favor on its breach of contract claim.

For the reasons discussed below, I am granting Springbrook's motion for summary judgment on its claim that defendants breached the contract by failing to pay invoices when due. I am also granting Springbrook's motion with respect to defendants' counterclaims, with one exception: defendants' counterclaim for breach of the duty of good faith and fair dealing. Although this claim appears to have little merit and it is not even clear that defendants actually are seeking to litigate it, this court cannot grant summary judgment on this counterclaim because Springbrook has failed to present any grounds for the court to do so. In the interests of

efficiency, I am directing defendants to show cause why their sole unresolved claim should proceed to trial.  Because this appears to be a tenuous claim and because the court is entering summary judgment on every other claim, I am striking the trial date, to be reset if necessary after the parties have been heard on this issue.

## UNDISPUTED FACTS

I note at the outset that many of defendants' proposed findings of fact and responses to plaintiff's proposed findings of fact contain legal contentions or additional facts that are not responsive to the fact proposed by plaintiff.  *See, e.g.*, Defendants' Proposed Findings of Fact, dkt. 73, Nos. 18, 28, 38; Responses to Plt.'s Proposed Findings of Fact Nos. 17, 18, 22-25, 32-39, 89-109.  In accordance with this court's *Procedure to be Followed on Motions for Summary Judgment*, I have disregarded any new facts that are not directly responsive to the proposed fact as well as any legal arguments disguised as "facts."  *See Procedure*, at 8, ¶4, attached to Pretrial Conference Order, dkt. 15.

For the purpose of deciding Springbrook's motion for summary judgment, I find the facts set out below to be material and undisputed.  Although most of these facts are drawn from the parties' proposed findings and responses, I have included a few additional facts from the record for narrative purposes.

## I.  The Parties

Plaintiff Springbrook Software, Inc. is an Oregon corporation that provides licensed software applications, technology solutions and professional services to local governments,

utilities and special districts.  Defendant Douglas County is a Wisconsin municipal corporation located in Superior, Wisconsin.  Defendant City of Superior is an incorporated Wisconsin city located within Douglas County.

## II.  Pre-Contract

In 2010, defendants Douglas County and the City of Superior sought to replace their outdated financial system software with a new system that was better equipped to meet their needs.  Douglas County was particularly interested in finding new highway department software that could be used to report certain mandated information to the Wisconsin Department of Transportation.

In January 2011, Douglas County and the City of Superior issued a formal Request for Proposals ("RFP"), seeking bidders from qualified firms "to supply and install Financial System Software."  RFP, attached to Aff. of Melissa Lauritch, dkt. 51, exh. 1, at  2.  The RFP stated: "The City and the County will collaborate with the selected vendor to create an installation plan, configure and implement the replacement system for the current software, convert all data and services to the new environment, and transfer knowledge and skills to system users."  *Id*. According to the RFP, the bidder's software systems should, "at a minimum," have the ability to perform various tasks within the following categories:  Financial Management, Payroll/Human Resources Management, Grant Management, Community Development and Inventory Management.  Id. at 14.  Additional modules that were "desirable" included Fleet Management, Utility Management, and Building Permit and Code Enforcement.  *Id*.

3

Section 10 of the RFP, titled "Essential Functionality," listed 361 specifications within each of these general categories that were "either required or desirable" by the County and City. Bidders were instructed to use a Vendor Response Key to indicate the degree to which they could meet the specification with or without modifications to each bidder's existing software product, and the additional cost, if any, that would result from customization. *Id*. at 20.

Around this time, Springbrook was developing a one-page flyer to promote the work it had done on its software that was specific to the needs of Wisconsin county highway departments, work done by Springbrook with assistance from the Wisconsin Department of Transportation. On January 24, 2011, Springbrook's product manager, Bert Lowry, emailed Doug Meek at the state Department of Transportation to ask if Meek "would object to [Springbrook] including verbiage like 'We worked closely with Doug Meek at the Wisconsin Department of Transportation to ensure our software meets the needs of Wisconsin county highway departments?'" Meek responded the next day, stating: "I don't object to your referencing working with me, but I don't think that 'working closely' is accurate." Meek asked that Springbrook send him a draft document prior to release or let him know how Springbrook had ended up phrasing this thought. Lowry replied that he would be happy to share a draft document and would use Meek's name only in a manner that Meek approved.

On February 9, 2011, Springbrook responded to the RFP stating that it was submitting a bid to "[c]reate an installation and replacement plan for Financial System Software, configure and implement the replacement for the current software, convert all data and services to the new environment, and transfer knowledge and skills to system users," along with one year of maintenance services. Aff. of Melissa Lauritch, dkt. 55, exh. 1 at 12. Using the Vendor

4

Response Key, Springbrook responded "F" to 305 of the 361 Essential Functionality items, indicating that the item would be "Fully provided 'out of the box' for no additional charge." However, Springbrook added this caveat: "Many questions and requirements are listed in short summary format only, and therefore can be interpreted differently than intended. The following is our best effort to respond based on understanding of each stated requirement." RFP Response, Section 9.0. Springbrook indicated that each project would have four major phases: Planning and Conversion; Installation and Setup; System Parallel; and Go-live Transition Support.

Springbrook's 261-page RFP Response included a one-page advertisement titled "Highway Department Solutions" in which Springbrook stated that it had "worked closely with the Wisconsin Department of Transportation to develop a highway department solution that is fully compliant with state requirements." The flyer did not mention Meek by name.

### III.   The County and City Choose Springbrook and Enter into a Contract

The City and County received five proposals in response to the RFP. All were evaluated by a seven-person committee from the City and the County finance departments. The committee reviewed each proposer's qualifications, including what modules they provided, the software reporting capabilities, the essential functions of the software, compatibility with the current system, the experience and technical support provided by the firm, and the cost. IT staff also reviewed the submissions to ensure they would be suitable for the City and County's specific needs. The committee determined that Springbrook's proposal best met the criteria, and the price was within budget.

On October 5, 2011, Springbrook and Douglas County entered into a Master Client Agreement (the "Agreement").  The Agreement speaks for itself and its contents are undisputed. For ease of reference, I am setting forth three portions of the Agreement in the facts.  First, Section 2, titled "Scope of Agreement," states:

> This Agreement states the terms and conditions pursuant to which Vendor will provide Products to the Client.  These general terms and conditions may be supplemented by the Product Addenda attached hereto and identified in Table A.  Client understands that all or certain portions of the Products sold or licensed under this Agreement may be provided by a third party service provider.  Any Client specific changes to the Products will require an addendum as defined under section 11.3.
>
> Any rights of Client provided under this Agreement shall also extend to the City of Superior, WI (Superior), and Superior will be subject to all of the restrictions, limitations and conditions provided in this Agreement.   Client will have the same responsibility to Vendor for the actions and omissions of Superior as Client would have if they were Client's actions or omissions.

The Agreement, along with various addenda and exhibits, was signed by Douglas County Administrator Andrew Lisak.  The addenda included a Professional Services exhibit, a Software License Agreement Addendum, a Software Maintenance Addendum and a "Douglas County, WI – Order Form."

Section 7 of the Software License Agreement Addendum called for the parties to complete a mutually agreed-upon Implementation Plan for the project.  Section 7 provides:

### 7.  IMPLEMENTATION PLAN

Within 10 days of the effective date of an order form, a mutually agreeable start date for the project will be determined.  Within thirty (30) days after the start Date of an Order Form, Vendor and Client shall complete a mutually agreed-upon implementation plan

6

('Implementation Plan'), which shall be incorporated into this Agreement by this reference and deemed a part thereof. The Implementation Plan shall include, but not be limited to, a delivery and installation schedule, creation of custom interfaces schedule and specifications, training schedule, testing schedules, requirements and schedule for integration with existing Client systems, and functional/performance specifications for the Licensed Software Product. In the event the parties are unable to complete a mutually-agreed upon Implementation Plan within said time period, Client may extend the time period to complete the Implementation Plan or Client may terminate this Agreement and upon such termination, Vendor shall refund to Client any amounts paid to Vendor under this Agreement. Within a reasonable period of time after termination, Client will return any Licensed Software Product components to Vendor. In the event the parties are able to mutually agree upon an Implementation Plan, failure of Vendor to perform its material obligations substantially in accordance with the requirements set forth in an Implementation Plan shall entitle Client, at its option, to (i) extend the time for Vendor to complete such obligations, or (ii) terminate this Agreement and obtain a refund of all amounts paid to Vendor hereunder provided that Client has returned the Licensed Software Product components to Vendor. Client's election of option '(i)' above shall not bar it from later meeting '(ii)' in the event Vendor fails to complete its obligations within the extended completion period. The parties may mutually agree to modify the Implementation Plan at any time. This provision applies only to the initial purchase, and not to optional modules or future order forms that may be executed by the parties after one year.

Section 3.3 of the Master Client Agreement provides that payments due under the Agreement are due 30 days from receipt of an invoice. This section further states:

No penalty and/or termination provision contained within this Agreement shall apply if Client withholds payment because a good faith dispute exists regarding a material duty, obligation or term contained in this Agreement. Unless otherwise requested by Client, Vendor shall continue to perform fully under this Agreement while said dispute is being resolved.

7

Additional contract provisions, where relevant, will be addressed in more detail in the opinion portion of this order.

At the time he signed the Master Client Agreement, Lisak also signed an Order Form which provided a breakdown of amounts due for products and services under the Agreement. Defendants agreed to pay Springbrook $399,000 at signing for the software package and implementation services, which included training and consulting, project management and conversion. Of the $399,000 paid at signing, $265,500 was for licensed software products. Training and consulting and project management fees were stated as lump sum figures, with different amounts owing for the City of Superior's and Douglas County's implementations, respectively.

Douglas County's implementation kick-off meeting was initially scheduled for February 2, 2012, but later delayed and held on May 2, 2012. The City of Superior's implementation kick-off meeting was held on August 7, 2012. The parties moved forward with implementation and conversion throughout 2012, with both Douglas County and the City of Superior providing "sign-offs" at various stages of the project. Although Douglas County had been scheduled to proceed with implementation first, various delays on the County's side resulted in the City moving ahead with its implementation before the County.

Springbrook invoiced defendants on a monthly basis. Without offering an explanation or otherwise disputing the invoices, defendants stopped paying Springbrook for services rendered beginning with Invoice Nos. INV22791 and INV22792, both of which were issued on July 31, 2012.

**IV.    Defendants Become Dissatisfied with the Springbrook Software and Stop Working Towards Implementation**

The City went live on three Springbrook software products on January 1, 2013. Meanwhile, however, the individuals from the Douglas County Finance Department who were working on the Springbrook implementation project developed concerns about the software's ability to meet their needs.  Among other things, they noted that the Highway reporting system did not yet exist and its projected date kept moving into the future; the system did not provide timber sale tracking and it would cost an additional $100,000 for Springbrook to write a custom program; and the system for creating certain reports in the Finance and Payroll modules was complicated and cumbersome.

On February 27, 2013, Douglas County told Springbrook that, due to year-end close, it was too busy to devote any time to the Springbrook implementation project or to discuss the software.  In response to emails from Springbrook expressing concern that the County not fall behind on the implementation of the Finance and Payroll modules, on March 6, 2013, Nancy Brown, the City's contract analyst, emailed Christine Herb, Springbrook's Vice President of Implementation Services, informing her that the County was "not ready to proceed with an implementation plan" at this time because of its concerns about the functionality of the software.  Aff. of Lauritch, dkt. 52, exh. G.  In response to Herb's request to schedule a conference call at which Brown could provide more details about the County's concerns, Brown declined, stating that she was "preparing a list of issues experienced by the County" that she would forward to Herb for her review.  Id.  After more than a month had elapsed, Herb emailed Brown on April 17, 2013 and asked when the list might be available; Brown replied that she would have something for Herb the following week.  However, neither Brown nor anyone from

the County provided Springbrook with such a list or with any other notice claiming that Springbrook was in breach of contract.

In mid-May 2013, the Douglas County Board of Commissioners adopted a resolution authorizing the purchase of different replacement software.  This fact, however, appears not to have been known by Springbrook, which continued to seek the County's cooperation in moving forward with the implementation.  But on May 14, 2013, Douglas County Finance Director Ann Doucette emailed Springbrook's Vice President of Business Development, expressing "doubt that any resolution other than a full refund would satisfy Douglas County."  Dkt. 74, exh. 19.

On or about June 13, 2013, Springbrook formally notified the County that it was $110,955.14 past due on its payments.

Meanwhile, the City of Superior decided that it did not like Springbrook's  software, particularly the payroll module.  On September 10, 2013, City Finance Director Jean Vito emailed Springbrook's project manager to inform him that the City had decided to "put a hold on everything and cancel any future training events" because of its displeasure with the payroll module.  Dkt. 74, exh. 21.  On September 12, 2013, Springbrook notified the City that it had halted its work on the project and intended to shut down access to the software based on the City's failure to pay and intent to terminate the Agreement .

On or about November 26, 2013, Springbrook formally notified the City of Superior that it owed approximately $158,458 to Springbrook for products, services, associated fees and expenses.

Attempts by the parties to resolve their differences failed.  This lawsuit followed.

10

# OPINION

## I.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, it must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in its favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The parties agree that Wisconsin law governs their dispute.

## II.   Defendants' Counterclaims for Misrepresentation, Fraudulent Inducement, and Violation of Wis. Stat. § 100.18

Defendants assert a trio of counterclaims for misrepresentation, for fraudulent inducement and for violation of Wisconsin's Deceptive Practices Act, Wis. Stat. § 100.18.  According to defendants, Springbrook intentionally misrepresented the capabilities of its

11

software in its response to defendants' RFP in order to win the job.  Springbrook has moved for summary judgment on all three claims because (1) all of the claims are barred under the plain terms of the parties' agreement; (2) the claims for misrepresentation and fraudulent inducement are barred by Wisconsin's economic loss doctrine; and (3) all three claims are meritless because defendants have no evidence that the representations were made with intent to defraud, or that they were material.

Before addressing these arguments, it is important to identify the allegedly false statements underlying defendants' misrepresentation claims.  In their proposed facts, defendants identify various alleged misrepresentations in Springbrook's response to the defendants' RFP, including statements about the payroll module and the forestry module.  *See* Defs.' PPFOF 22-26.  In the argument section of their brief, however, defendants focus solely on Springbrook's assertion, in the one-page multicolored flyer (defendants label it an "advertisement") included with its RFP response, that "Springbrook worked closely with the Wisconsin Department of Transportation to develop a highway department solution that is fully compliant with state requirements."  Defs' Br., dkt. 70 at 5.

Accordingly, because defendants have not developed any meaningful argument with respect to Springbrook's *other* allegedly false statements, I have disregarded them.  Insofar as defendants intended to bring misrepresentation claims on the basis of the alleged statements regarding the payroll and forestry modules, those claims are deemed to have been waived.  *See United States v. Mason*, 974 F.2d 897, 901 (7th Cir.1992) (failure to cite case law or identify facts from the record in support of argument waives an argument on appeal); *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir.), *cert. denied*, 120 S.Ct. 549 (1999) ("Given our adversarial

12

system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (internal citations and quotations omitted).[1]

### A.  The Parties' Agreement

Citing to various provisions in the Agreement, Springbrook contends that defendants have disclaimed their right to recover for common law and statutory misrepresentation in exchange for negotiated contract damages.  In response, defendants make the strange argument that this court should not even consider the Agreement because there are "pivotal factual questions as to the existence and/or terms of the parties['] agreement."  Br. in Opp., dkt. 70, at 18.  According to defendants, the Agreement is "incomplete" and is either ambiguous or unenforceable because the parties never completed the Implementation Plan called for by Section 7 of the Software License Agreement Addendum.

This argument is founded on defendants' conclusory assertion that the Implementation Plan was intended to be a "single document describing each phase of implementation of each piece of software"— a document they say does not exist.  Br. in Opp., dkt. 70, at 19.  Section 7, however, does not specify any particular form that the plan had to take.  Regardless whether the parties wrote down their implementation plan, it is plain from the record that they had one.

---

[1] As for the one-page flyer touting Springbrook's highway reporting system, I further conclude that defendants have waived any misrepresentation claim with respect to that statement except for the representation that Springbrook "worked closely" with the Wisconsin DOT.  I discuss this finding in section II C., below.

Defendants' own evidence contains at least six emails from Springbrook to defendants regarding calendaring various phases of the project and knowledge by defendants' project coordinator, Brenda Ostrander, of the project schedule.  *See* dkt. 74, exh. 17 (Sept. 20, 2012 email from Ostrander to Heidrich noting that County did not feel it had enough time "in between setup sessions" and would not be ready to "go live Nov 5th.")  Evidence adduced by Springbrook contains emails between city and county financial department staff and Springbrook that refer to conversion kick-off dates and implementation dates for various modules, Aff. of Melissa Papaleo, dkt. 85, exhs. 8, 18-20; Douglas County's Judy Nicoski acknowledged having been present with several individuals at a meeting with Springbrook where the "timeline for the conversion was all laid out." Dep. of Judy Nicoski, dkt. 89, at 57-58.  The Douglas County Implementation Kick-Off meeting was first scheduled for February 2, 2012, but then was pushed back to and ultimately held on May 2, 2012.  The City of Superior's Implementation Kick-Off meeting was held on August 7, 2012.  The parties moved forward with implementation and conversion throughout 2012 and into 2013, with both Douglas County and the City of Superior providing "sign-offs" at various stages of the project. The City of Superior went live on three software modules.  In the face of this evidence, it is disingenuous for defendants to assert that the parties had no implementation plan.

But even if the facts supported defendants' "missing Implementation Plan" argument, the law does not support their "unenforceable contract" theory.  Although defendants' position is not entirely clear from their brief, they appear to argue that completion of the Implementation Plan was a "condition precedent" that had to be satisfied before the Agreement took effect. "Condition precedent" is a term sometimes used by courts, including Wisconsin courts, to

describe a condition placed on a contract that delays the enforceability of the contract until the condition is fulfilled. *Fox v. Catholic Knights Ins. Soc.*, 2003 WI 87, 263 Wis. 2d 207, 222, 665 N.W.2d 181, 188; *Woodland Realty, Inc. v. Winzenried*, 82 Wis.2d 218, 223, 262 N.W.2d 106 (1978). An agreement to purchase real estate contingent on the buyer's ability to obtain financing is an example of a condition precedent.

The language of Section 7 does not support defendants' contention that the enforceability of the Agreement was conditioned on the parties reaching a mutually-agreeable Implementation Plan. To the contrary, the fact that Section 7 allowed defendants to "terminate" the Agreement in the event the parties could not agree on an Implementation Plan indicates the parties' understanding that the Agreement was in effect until such an impasse was reached. In short, defendants were not relieved of their obligation to pay their invoices because of the alleged lack of an Implementation Plan.

Defendants are on more solid ground insofar as they appear to argue that Section 7 is void for indefiniteness. *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 178, 557 N.W.2d 67 (1996) (contract must be definite as to the parties' basic commitments and obligations). As Springbrook acknowledges, Section 7 is an "agreement to agree;" such agreements are unenforceable because there is no meeting of the minds as to the agreement's essential terms. *Dunlop v. Laitsch*, 16 Wis.2d 36, 42, 113 N.W.2d 551 (1962). Nonetheless, maintains Springbrook, the unenforceability of Section 7 has no bearing on the remainder of the agreement because the Agreement contains a severability clause. It states:

> If any part of this agreement is held to be invalid or unenforceable
> for any reason . . . then . . . such provision shall be deemed omitted
> from this Agreement, and the remaining provisions will continue
> in full force without being impaired or invalidated in any way.

Master Client Agreement, Section 11.5.

15

In Wisconsin, a severability clause itself is not controlling, but is entitled to "great weight" in determining whether the remainder of a contract is enforceable. *In re F.T.R.*, 2013 WI 66, ¶ 58, 349 Wis. 2d 84, 119-20, 833 N.W.2d 634, 651. "If a contract contains an illegal clause, the remaining portions of the contract can be enforced if severing the illegal portion does not defeat the primary purpose of the bargain." *Id*.

As will be discussed in more detail below in the context of the economic loss doctrine, the primary purpose of the Agreement in this case was to provide Springbrook's licensed software products to defendants. Even without the Implementation Plan provision, the Agreement's remaining provisions are adequate to further this purpose. These provisions include a license to the software, maintenance service and a warranty by Springbrook that it would provide the consulting and other services specified in the Order Form in a workmanlike manner, and with professional diligence and skill. *See* Agreement, Exhibit B–Professional Services; Springbrook Software License Agreement Addendum; Springbrook Software Maintenance Addendum, attached to Amended Complaint, dkt. 16, at Exh. A. Giving the severability clause the "great weight" to which it is entitled, I conclude that the remainder of the Agreement is enforceable notwithstanding the unenforceability of the Implementation Plan provision.

Having found the Agreement enforceable, I return to Springbrook's contention that its terms bar defendants' misrepresentation claims. Wisconsin courts will enforce an exculpatory contract provision where it is specific as to the tort being disclaimed. *Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶ 36, 294 Wis. 2d 800, 819, 720 N.W. 2d 716 (where a contract includes a disclaimer that is specific as to the tort that is being disclaimed and disclaimer makes it "apparent that an express bargain was struck to forego the possibility of tort recovery in

16

exchange for negotiated alternative economic damages," disclaimer is enforceable).  In *Peterson*,

for example, the contract had "three different provisions [which] expressed that all prior

negotiations were excluded and that only the text of the written documents constituted the

contract."  *Peterson*, 294 Wis.2d 800, ¶ 37, 720 N.W.2d 716.  One of the three clauses stated:

> The Buyer acknowledges, subject to the Limited Warranty
> contained in Exhibit E . . . (c) other than those written
> representations concerning the condition of the Property
> contained in the Condominium Offer to purchase, including the
> Exhibits annexed thereto, *she has not relied on any representations
> made by the Seller in entering into the Condominium Offer to
> Purchase* . . .

*Id.*, ¶ 37 (emphasis in original).  The Wisconsin Court of Appeals concluded that the quoted

integration clause "specifically disclaims the purchaser's right to rely on any alleged fraudulent

misrepresentations" and that "the three provisions . . . provide exactly the kind of specific

disclaimer that makes it apparent that an express bargain had been struck."  *Id*. (citation

omitted).  Accordingly, it held that the integration clauses barred a claim under Wis. Stat.

§ 100.18.  *Id.*, ¶ 40.

 None of the provisions that Springbrook identifies here, whether considered separately

or together, are equivalent to the specific disclaimer in *Peterson*.  Springbrook first points to

section 11.2, which states:

> This Agreement, including the Product Addenda and any Order
> Forms or Statements of Work, constitutes the entire Agreement
> between the parties and supersedes all previous and
> contemporaneous agreements, understandings and arrangements
> with respect to the subject matter hereof, whether oral or written.

This is nothing more than a typical integration clause, providing that all discussions prior to

entering into the written agreement were negotiations and the written agreement constitutes the

final agreement between the parties.  Section 11.2 does not mention disclaiming liability, nor does it specify any tort or cause of action.

Next, Springbrook points to section 6.2, a disclaimer provision that states:

> VENDOR MAKES NO WARRANTY THAT THE PRODUCTS WILL . . . MEET THE NEEDS OR REQUIREMENTS OF CLIENT OR ITS USERS, OR WILL OPERATE IN THE COMBINATIONS THAT MAY BE SELECTED FOR USE BY CLIENT OR ITS USERS.

Springbrook also points out that under section 6.1, defendants "assume[d] all responsibility for the selection of, appropriateness of, use of, and results obtained from the Products and Output . . .".

Again, however, neither sections 6.1 or 6.2 contains language that would put defendants on notice that they were waiving liability for any tort or statutory claim, nor does either section specifically provide that the defendants disclaim reliance on any prior representations by Springbrook.  These sections amount to an "as is" clause, which the Wisconsin Court of Appeals has held does not shield the seller from tort claims based upon affirmative misrepresentations. *Grube v. Daun*, 173 Wis. 2d 30, 60, 496 N.W. 2d 106, 117 (Ct. App. 1992).

Finally, Springbrook points to section 8.3, which states:

> THE FOREGOING LIMITATIONS APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION, . . . MISREPRESENTATION AND OTHER TORTS, AND STATUTORY CLAIMS.   EACH OF THE PARTIES ACKNOWLEDGES THAT IT UNDERSTANDS THE LEGAL AND ECONOMIC RAMIFICATIONS OF THE FOREGOING LIMITATIONS, AND THAT THE FOREGOING LIMITATIONS ALLOCATE THE VARIOUS RISKS BETWEEN THE PARTIES AND FORM AN ESSENTIAL PART OF THE AGREEMENT OF THE PARTIES . . .

Section 8.3 *is* specific about the types of claims that it covers, among which are "misrepresentation" and "statutory claims."  Nevertheless, it is *not* an "unequivocal disclaimer"

18

by Springbrook of responsibility for misrepresentations about its software.  Springbrook ignores the context in which section 8.3 appears.  Contrary to Springbrook's suggestion, the "foregoing limitations" referenced in section 8.3 cannot be reasonably read as referring to either section 6.2 or 11.2.  Rather, the "foregoing limitations" to which 8.3 refers are those set forth in sections 8.1 and 8.2, which appear under section 8's heading titled "Limitation of Liability."  Section 8.1 is titled "Waiver of Consequential Damages" and is what it says:  a waiver by both parties of any right to recover punitive or consequential damages.  Section 8.2 is titled "Cap on Liability" and provides that

> IN NO EVENT WILL THE TOTAL LIABILITY OF EITHER PARTY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED TWO(2) TIMES THE TOTAL AGGREGATE FEES PAID AND OWING BY CLIENT UNDER THIS AGREEMENT . . . ."

 Read in context, it is plain that these two limitations, the waiver of consequential damages and the cap on liability, are the "foregoing limitations" to which section 8.3 refers.

So understood, section 8.3 actually defeats Springbrook's contention that defendants specifically disclaimed their right to bring any common law or statutory misrepresentation claims.  By specifying that "misrepresentation and other torts, and statutory claims" would be subject to the waiver of consequential damages and cap on liability, it seems clear enough that the parties contemplated the possibility that such claims could be brought, notwithstanding the various contract provisions which make clear that Springbrook was not guaranteeing that its software would meet defendants' needs.  Finding nothing in the contract provisions cited by Springbrook to indicate otherwise, I find that defendants' misrepresentation claims are not barred by the Agreement.

### B.    Economic Loss Doctrine

Springbrook contends that, even if not specifically disclaimed, defendants' fraudulent inducement and misrepresentation claims are barred by Wisconsin's economic loss doctrine. (Springbrook concedes that the economic loss doctrine does not apply to false advertising claims under Wis. Stat. § 100.18.  *Below v. Norton*, 310 Wis.2d 713, 720, 751 N.W.2d 351 (2008); *Kailin*, 643 N.W. 2d 132, 149 (Wis. Ct. App. 2002).)  The economic loss doctrine is a judicially created doctrine that seeks to preserve the distinction between contract and tort.  *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 403-04, 573 N.W.2d 842 (1998).  From its inception, the doctrine has been based on the understanding that contract law, and particularly the law of warranty, is better suited than tort law for dealing with purely economic loss in the commercial arena.  *Id.*

Three principles generally underlie the application of the economic loss doctrine to tort actions between commercial parties:  "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk."  *1325 N. Van Buren, LLC v. T-3 Grp., Ltd.*, 2006 WI 94, ¶ 25, 293 Wis. 2d 410, 428-29, 716 N.W.2d 822, 831 (quoting *Daanen & Janssen*, 216 Wis. 2d at 403, 573 N.W.2d 842).  Where, as in this case, the parties are sophisticated and have entered into a written, bargained-for agreement that allocates risk and provides available remedies, the case is "tailor made" for the application of traditional contract law.  *Id.* at ¶28.

Defendants do not dispute that their loss is economic in nature.  They contend, however, that their tort claims are not barred because they meet one of two exceptions to the economic loss doctrine: (1) the exception for claims of fraudulent inducement; and (2) the exception for service contracts.

### 1.  The Fraudulent Inducement Exception

The fraudulent inducement exception applies in situations where parties to a contract may *appear* to be negotiating freely, but one party's fraudulent behavior results in the other party's inability to negotiate fair terms and make an informed decision.  *See Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶ 30, 274 Wis.2d 631, 683 N.W.2d 46.  For the fraudulent inducement exception to apply, the alleged fraud must be extraneous to the agreement; that is, it must not concern a matter that is interwoven with the contract.  *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, at ¶42, 283 Wis. 2d 555, 585, 699 N.W. 2d 205 (citing *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 2, 262 Wis.2d 32, 662 N.W.2d 652).  A misrepresentation that is "interwoven" with the contract is one concerning "matters whose risk and responsibility relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract."  *Id*. at ¶34.  Misrepresentations about the quality or character of goods sold are misrepresentations that are either (1) dealt with expressly under the contract's terms; or (2) "go to the reasonable expectations of the parties to the risk of loss in the event the good purchased did not meet the purchaser's expectations."  *Id*. at ¶45 (citations omitted).

Here, any representations by Springbrook about the capabilities of its software are interwoven with the Agreement. As Springbrook points out, the Agreement contains various provisions that address the quality and character of the purchased software. In particular, Section 6 of the Master Client Agreement states, at Section 6.1, that defendants "assume[d] all responsibility for the selection of, appropriateness of, use of, and results obtained from the Products and Output." Section 6.2 is a Disclaimer provision, which states as follows:

> EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, THE PRODUCTS ARE PROVIDED "AS IS," WITHOUT ANY WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE, TITLE NON-INFRINGEMENT OR NON-MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY, CUSTOM, TRADE, QUIET ENJOYMENT, ACCURACY OF INFORMATIONAL CONTENT OR RESULTS, OR SYSTEM INTEGRATION, OR ANY WARRANTIES OR CONDITIONS ARISING UNDER ANY OTHER LEGAL REQUIREMENT. EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, VENDOR MAKES NO WARRANTY THAT THE PRODUCTS WILL RUN PROPERLY ON ALL HARDWARE, THAT THE LICENSED SOFTWARE, HOSTED SERVICES OR OTHER PRODUCTS WILL MEET THE NEEDS OR REQUIREMENTS OF CLIENT OR ITS USERS, OR WILL OPERATE IN THE COMBINATIONS THAT MAY BE SELECTED FOR USE BY CLIENT OR ITS USERS, OR THAT THE LICENSED SOFTWARE OR HOSTED SERVICES WILL BE UNINTERRUPTED OR ERROR FREE.

In a similar vein, section 3.1 of the Software License Agreement Addendum provides that, after going "live" with a particular Springbrook software product, defendants had a 60-day acceptance period within which to validate that the software was performing in accordance with the functional criteria set forth in various documents, including Springbrook's response to the RFP. Section 3.1 goes on to provide that:

> Both parties understand that disagreements may arise based on the client's understanding of the information being requested in the [RFP] and the Vendor's understanding of the request and its corresponding response.  In such case both parties will work together on a mutually agreeable solution.  Disagreements of this nature shall not be considered a breach of this agreement. [*possessive apostrophes added*]

Finally, section 8.3 of the Master Client Agreement specifically identifies "misrepresentation and other torts" as causes of action subject to the Agreement's cap on liability and limitations on consequential damages.

These provisions clearly establish that the parties intended the Agreement to address and allocate risk in the event the software did not meet defendants' expectations.  Therefore, any alleged misrepresentations relating to the performance and capabilities of Springbrook's software are interwoven with the Agreement  and subject to the economic loss doctrine.

Indeed, defendants fail to develop any meaningful argument to the contrary.  The only alleged misrepresentation that they have identified as being "extraneous" to the Agreement  is Springbrook's statement that it worked "closely" with the Wisconsin Department of Transportation.  Defendants assert that this statement "has no bearing on the performance of the contract or the quality of the services provided in the contract."  Br. in Opp., dkt. 70, at 14. I disagree.  Springbrook's claim of having worked closely with the Department of Transportation regarding the highway reporting program bears directly on Springbrook's ability to deliver a software program that met Douglas County's needs with respect to the State's highway reporting requirements.  The parties accounted in their Agreement  for the risk that the highway program would not perform as expected.  Accordingly, Springbrook's statement that it worked "closely"

with the WisDOT does not qualify for the fraudulent inducement exception to the economic loss doctrine.[2]

### 2. The Service Contract Exception

Taking a different tack, defendants argue that their contract with Springbrook was a service contract and therefore the economic loss doctrine does not apply. *See, e.g., Insurance Co. of North America v. Cease Electric Inc.*, 2004 WI 139, ¶ 29–32, 276 Wis.2d 361, 688 N.W.2d 462, 467–72 (2004). In Wisconsin, the purpose of this exception stems from the inapplicability of the Uniform Commercial Code (U.C.C.) to contracts for services. *See id*., 2004 WI 139, ¶ 29–32, 276 Wis.2d 361, 688 N.W.2d 462. The Wisconsin Supreme Court reasoned that, while the U.C.C.'s built-in warranty provisions provide adequate remedies for breach of contract for the sale of goods, it does not contain similar provisions for service contracts. *Id*. ¶¶ 31, 35.

Springbrook does not dispute that it was to provide certain services under the Agreement, including software design, data conversion and training. As it points out, however, the mere fact that certain services were encompassed by the Agreement does not automatically trigger the services contract exception to the economic loss doctrine. Rather, when a contract encompasses both products and services, Wisconsin uses the "predominant purpose" test to determine whether a mixed contract for products and services is predominantly a sale of a product and therefore subject to the economic loss doctrine, or predominantly a contract for services and therefore not subject to the economic loss doctrine. *Linden v. Cascade Stone Co.*, 2005 WI 113,

---

[2] Even if this alleged misrepresentation survived application of the economic loss doctrine, Springbrook still would be entitled to summary judgment for the reasons discussed in section II C, *infra*.

¶ 8, 283 Wis. 2d 606, 614, 699 N.W.2d 189, 193.  *See also Schreiber Foods, Inc. v. Lei Wang*, 651 F.3d 678, 684 (7th Cir. 2011).

In determining a contract's predominant purpose or "thrust," courts are to "examine all the factors before them, both objective and subjective, to determine the predominant purpose of a contract." *Id*. at ¶22, 283 Wis. 2d 606, 621, 699 N.W.2d 189, 196.  Specific factors typically examined include "the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, the circumstances of the parties, and the primary objective they hoped to achieve by entering into the contract." *Id.* at ¶21, 283 Wis. 2d 606, 699 N.W. 2d 189 (internal citations omitted).

Applying these factors in *Linden*, the Wisconsin Supreme Court determined that a contract to build a new house was predominantly for a product. Although the contract contained a mix of service and product words, the court concluded after examining the entire document that the primary reason the Lindens entered into the contract was to have a house custom built for them. *Id.*, ¶ 25, 699 N.W.2d 189.  The court noted that the contract began by outlining the specifications of the project, namely a two-story home and garage with certain square footage. *Id*.  Furthermore, the project was billed as a "'fixed price contract,' not changing based on the hours worked, but only on changes in the specifications . . .. This shows that the parties bargained for costs based on the specifications of the house, not the amount of work put into completion of the project." *Id*.  Considering the totality of these circumstances, the court found that the predominant purpose of the contract was for a product—a new house.  *Id*.

Applying these principles to the parties' Agreement in this case, I find the contract to be predominantly for a product, namely, licensed software.  As the RFP makes clear, defendants'

predominant goal was to find a software package that met various, pre-determined specifications. Although bidders were asked to provide information about their support services, the thrust of the RFP was to obtain detailed information about a bidder's software and the functions it could perform.

The language of the Agreement contains a mix of product and service terms, with certain addenda focused specifically on services that Springbrook would provide under the contract. However, Section 2 of the Master Client Agreement, titled "Scope of Agreement," states: "this Agreement states the terms and conditions pursuant to which the Vendor will provide products to the Client."  The term "Products" is defined as "items purchased by Client as set forth in an Order Form in accordance with applicable addendum:  Licensed Software Products, Subscription Services, Support Services, Professional Services, and Product Customization."  The term "Licensed Software Products" is defined as:

> the machine readable, object-code version of the software licensed by Vendor, including all related Documentation and any modified, updated, or enhanced versions of the program that Vendor may provide to Client, as set forth in the appropriate Order Form and under the terms and conditions of this Agreement and attached addenda.

The parties also negotiated a detailed Software License Agreement Addendum setting forth various terms and conditions of defendants' license to Springbrook's software.  Reading the Agreement  as a whole, it supports the conclusion that the parties' primary goal was to contract for the sale of a software package as opposed to services.

The parties' billing arrangement also supports the conclusion that the predominant purpose of the Agreement was the provision of a good.  Springbrook did not bill defendants on an hourly basis but rather charged a lump sum for each software module, with additional sums

26

due for software maintenance fees, project management and training services. The first Order Form signed by the parties on October 5, 2011 shows that of the $399,000 in fees payable by defendants on that date, two-thirds— $265,500—was for software licenses.

To be sure, a significant amount of the fees *owed* under the Agreement are for Springbrook's services. Among other things, Springbrook's employees consulted with defendants, developed time lines, customized certain aspects of its software, installed the software and trained defendants' users. Like the builder's services in constructing the house in *Linden*, however, Springbrook's services were incidental to and supportive of the primary purpose of the Agreement . As observed by another court in this circuit, "[a]ny supplier of a specially designed item must necessarily perform whatever work is required to create or produce the item. But this does not make the undertaking a 'service' to the purchaser of the item." *Analysts Int'l Corp. v. Recycled Paper Products, Inc.*, No. 85 C 8637, 1987 WL 12917, at *3 (N.D. Ill. June 19, 1987). As in *Analysts Int'l* and *Linden*, the thrust of what the parties contracted for in this case, although requiring some work on the part of the supplier, was the end-product of that work.

The cases cited by defendants do not warrant a different conclusion. In *Micro-Managers, Inc. v. Gregory*, 147 Wis. 2d 500, 434 N.W.2d 97 (Ct. App. 1988), for example, the court examined a contract for the development of custom software. The plaintiff had been hired to design and develop software to operate a new programmable controller that was to replace equipment used by an industrial manufacturing company. *Id*. at 504, 434 N.W. 2d at 98-99. In concluding that the contract was primarily for services, the court focused on how plaintiff billed the defendant for its work, noting that the contract provided that defendant would be charged on the basis of time, at stated rates, and materials. *Id*. at 508, 434 N.W. 2d at 100.

27

The court also noted that the contract spoke in terms of "man-days," "development," "time," and "design," all of which connoted the rendition of services as opposed to a sale of goods. *Id*. at 509. Finally, the court pointed to a letter between the parties stating that, of the $59,828 projected total, $55,968 was for labor. *Id*.

In contrast to the contract at issue in *Micro-Managers*, the parties' billing arrangement in this case is consistent with a conclusion that the Agreement primarily is a contract for goods. As noted above, the bulk of the fees owed by defendants were for the licensed software products and their maintenance fees. Where services were called for, such as training and consulting, they were charged as a flat fee, not on the basis of time.

*Racine Cnty. v. Oracular Milwaukee, Inc.*, 2009 WI App 58, ¶ 1, 317 Wis. 2d 790, 793, 767 N.W.2d 280, 281-82 *aff'd on other grounds*, 2010 WI 25, ¶ 1, 323 Wis. 2d 682, 781 N.W.2d 88, also does not help the defendants. In that case, no one disputed that the Consulting Service Agreement at issue was a contract for services. The question before the court was whether the computer consulting services that were to have been provided under the contract were "professional" services and if so, whether expert testimony was required to establish a standard of care. *Id*. at ¶¶10-16. (The court answered "no" to both questions.) *Oracular* is therefore not on all fours with this case.

In sum, the court finds that the parties' Agreement is predominantly a contract for licensed software, a product. Accordingly, the economic loss doctrine applies. Therefore, plaintiff's motion for summary judgment dismissing defendants' claims for fraudulent inducement and misrepresentation will be granted.

**C.  Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18**

As noted above, defendants' claim under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, survives the economic loss doctrine.  To succeed on this claim, defendants must adduce evidence from which a jury could find that: (1) Springbrook made a representation to the public with the intent to induce an obligation; (2) the representation was untrue; and (3) it caused defendants a pecuniary loss.  *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis.2d 109, 732 N.W.2d 792 (quoting Wis. Stat. § 100.18).

The sole alleged misrepresentation on which defendants' § 100.18 claim rests is Springbrook's statement, on its one-page flyer (or advertisement) submitted with its February 2011 RFP response, that Springbrook had "worked closely" with the Wisconsin Department of Transportation to develop a highway department solution that was fully compliant with state reporting requirements.  For reasons I will explain in a moment, I set out defendants' argument in full, verbatim:

> The evidence shows that Springbrook made a representation with the intent to win the RFP process.  When Springbrook learned on January 24, 2011 that the County and City's RFP was on the verge of release, that same day Springbrook sought approval from Wisconsin Department of Transportation Senior Auditor Doug Meek to advertise and tout that it had "worked closely" with the Wisconsin Department of Transportation to develop a highway department solution that is fully compliant with state requirements.  Springbrook's representation was untrue, deceptive and misleading, as Springbrook had not "worked closely" with the Department and instead had merely received information from WisDOT months and years prior–back in 2008.  Because there had been no collaboration between Springbrook and Doug Meek, he refused to approve Springbrook's draft advertisement regarding the close relationship between Springbrook and WisDOT.  Regardless of this fact, and knowing the importance of a fully

> compliant "highway department solution" to Wisconsin counties, Springbrook published the advertisement in its RFP response anyway. Springbrook won selection in the RFP based on that advertisement.

> Br. in Opp., dkt. 70, at 12.

Defendants support this last assertion with affidavits from the City and County finance directors, both of whom were on the selection committee and who have declared that the advertisement was the "tipping point and the reason Springbrook was selected." Dec. of Ann Doucette, dkt. 79, at ¶7; Dec. of Jean Vito, dkt. 80, at ¶7.

Springbrook is entitled to summary judgment on this claim. First, the testimony from two members of the selection committee is not specific enough to create a genuine dispute on the element of causation. The only thing that Springbrook supposedly misrepresented is the closeness of its working relationship with the Wisconsin DOT. After all, Meek did not deny that he had worked with Springbrook; he took issue only with the adverb "closely." Neither Doucette nor Vito asserts that she would have voted against awarding the bid to Springbrook if she had been told simply that Springbrook had "worked with" WisDOT, rather than "worked closely" with it.[3] Absent a causal connection between the untrue, deceptive, or misleading representation and the pecuniary loss, defendants cannot maintain their § 100.18 claim. *Tim Torres Enters., Inc. v. Linscott*, 142 Wis.2d 56, 70, 416 N.W.2d 670 (Ct. App. 1987); Wis JI-Civil 2418.1516.

This segues to a related problem with defendants' claim: Springbrook's use of the phrase "worked closely" is not legally actionable. The adverb "closely" is not a term of art and it can

---

[3]In their affidavits, Doucette and Vito complain about problems with other modules of Springbrook's software, but defendants are not alleging these in their deceptive trade practices claim.

mean different things to different people; was Meek's  definition of "closely" tighter, looser or the same as Doucette or Vito's–or Springbrook's–definition?  To be actionable under Wis. Stat. § 100.18, a statement must constitute a misrepresentation of *fact*.  *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶ 28, 349 Wis. 2d 587, 607, 836 N.W.2d 807, 817.  This means that the speaker must make a representation about the nature or quality of a product that is specific enough that its truth or falsity can be determined.  *Id*. at ¶ 25-26.  In contrast, vague statements or exaggerations that "convey only the seller's opinion" and are of the sort "reasonably to be expect of a seller as to the degree of quality of his product"— *a.k.a.* puffery— are not actionable because they cannot be substantiated or refuted.  *Id*. at ¶ 25.

Springbrook's amorphous statement that it worked "closely" with the Wisconsin DOT falls into this latter category.  Like a seller's representation that his product had a "long equipment life," *Consol. Papers, Inc. v. Dorr–Oliver, Inc.*, 153 Wis.2d 589, 594, 451 N.W.2d 456 (Ct. App. 1989), Springbrook's general representation that it had worked "closely" with the Wisconsin DOT expresses only Springbrook's judgment as to the nature of the relationship, not a specific fact that can be substantiated or refuted.  In fact, even Meek has acknowledged that the question was a matter of opinion.  Dec. of Douglas Meek, dkt. 76, at ¶7 ("I would not characterize my involvement as 'working closely' with Springbrook.....[l]imited emails and phone calls answering questions is not my definition of 'working closely'").  The mere fact that Springbrook published the advertisement notwithstanding this difference of opinion does not subject it to liability for false advertising.

In sum, Springbrook is entitled to summary judgment on defendants' false advertising claim.  For completeness's sake, however, I note that defendants proposed a number of facts and

adduced evidence calling into question a different statement in Springbrook's highway flyer: namely, its representation that it had a highway department solution that was "fully compliant" with state reporting requirements.  *See* Defs.' PPFOF #s 4-6, 18, 20.  Unlike the "worked closely" statement, the "fully compliant" statement arguably could be substantiated or refuted and therefore would seem to be actionable under § 100.18.  However, defendants have advanced this claim only in the shadows, mentioning it only in their proposed finding of fact and then in the fact section of their brief.  Out in the light of their argument, defendants fail to articulate any legal theory or devote any analysis to the "fully compliant" statement, focusing solely on the alleged falsity of the "worked closely" statement.  Not surprisingly, Springbrook has followed suit, addressing only the "worked closely" statement on reply.

This court does not consider arguments "camouflaged" as disputed facts or raised in the facts section of a party's brief.  *Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001) ("A plaintiff's recital of the facts of the case triggers no duty on the part of the judge to research, construct, and further research the best legal arguments he can for that fact-reciting party.").  Nor is it this court's role to attempt to divine the parties' legal theories or make arguments on their behalf.  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs" or in the record).  A party wishing to be heard on the legal merits of its claims cannot merely recite facts, but must develop an argument by identifying the claim, citing relevant legal authority and explaining why that authority supports his claim.  Defendants have failed to do this with respect to any other statement by Springbrook apart from the "worked closely" statement.  Thus, to the extent that

defendants may have wished to press a false advertising claim based upon other statements, they have waived their opportunity to do so.

## III.  Breach of Contract Claims

Springbrook contends that defendants breached the Agreement by failing to pay invoices when due.  Defendants do not deny that they withheld payment, but contend that they were justified in doing so because of Springbrook's failure to provide software and services "in accordance with the requirements set forth in the Agreement."  Defendants have asserted their own claim for breach of contract based upon these alleged failures.  Springbrook asks the court to dismiss defendants' counterclaim and grant its claim for breach of contract.

A breach of contract claim has three elements: (1) a valid contract; (2) a violation or breach of the terms of that contract; and (3) damages.  *Riegleman v. Krieg*, 2004 WI App 85, ¶20, 271 Wis. 2d 798, 679 N.W. 2d 857.  It is well-settled that, when a party materially breaches a contract, the non-breaching party is excused from further performance.  *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183, 557 N.W. 2d 67 (1996).  A breach is material when it is "so serious as to destroy the essential object of the agreement."  *Ranes v. Am. Family Mut. Ins. Co.*, 219 Wis. 2d 49, 57, 580 N.W. 2d 197, 200 (1998).  The question here is whether defendants have adduced sufficient evidence from which a jury could find that Springbrook breached the Agreement first.

The answer is no.  In spite of all their complaints about Springbrook's performance, the only provision of the agreement that defendants mention in their brief is the Implementation Plan provision.  According to defendants, "the repeated failure of Springbrook to provide viable,

agreeable Implementation Plans constitutes a breach and justifies termination." Br. in Opp. dkt. 70, at 20.  As discussed previously, however, there are no facts to support defendants' claim and in any case, Section 7 is unenforceable.

Even if Section 7 were enforceable and even if defendants had facts to support their claim that no mutually-agreeable implementation plan was created, defendants have waived their right to contend that the provision was breached or to terminate the Agreement on that basis. Defendants have adduced no evidence showing that they actually took any steps to terminate the Agreement based on the lack of an implementation plan.  To the contrary, the record shows that defendants continued towards implementation despite their alleged belief that no implementation plan had ever been agreed to.  By choosing this course of action, defendants waived any right they might have had to terminate the Agreement for the parties' failure to reach a mutually-agreed upon implementation plan.  *See, e.g., Fun-N-Fish v. Parker*, 10 Wis. 2d 385, 390 (1960) (where offer to purchase resort gave plaintiff right to set aside contract upon failure to obtain necessary licenses, plaintiff waived such condition by electing to purchase and assume control of land before ascertaining whether licenses would be issued); *Atwell Building Corp. v. Sound*, 171 F.2d 253, 254 (7th Cir. 1948) (by accepting rent after learning that bankruptcy proceeding had been instituted against tenant, landlord elected to ignore breach and thereby waived right to contend that the lease had been terminated by the institution of the bankruptcy proceeding).

Having found there to be no genuine dispute that defendants breached the Agreement first by failing to pay invoices when due, and that their own breach of contract claim has no

merit, I conclude that Springbrook is entitled to summary judgment on its breach of contract claim and to dismissal of defendants' counterclaim.

## IV.  Breach of Covenant of Good Faith and Fair Dealing

In their Counterclaim, defendants allege that Springbrook breached the implied covenant of good faith and fair dealing by "violating the spirit of the Agreement, even if Springbrook did not violate the express terms of the Agreement."  Counterclaim, dkt. 18, at ¶143.  Although Springbrook identifies this claim as subsumed within its all-inclusive request for summary judgment, it has not advanced any grounds for obtaining summary judgment.  By the same token, defendants have not pressed this claim in their response, so it is unclear whether they still intend to litigate it.

Wisconsin construes the duty of good faith and fair dealing to cover acts of constructive bad faith, failure to act, carelessness, neglect and other actions that frustrate the purpose of the agreement. *N. Crossarm, Inc. v. Chem. Specialties, Inc.*, 332 F. Supp. 2d 1181, 1188 (W.D. Wis. 2004).  As the Wisconsin Court of Appeals explained in *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 797, 541 N.W.2d 203, 213 (App.1995) (quoting the Restatement (Second) of Contracts § 205 cmt. d):

> "[s]ubterfuges and evasions violate the obligation of good faith in performance even the actor believes his conduct to be justified.... A complete catalogue of types of bad faith is impossible, but the following types are among those that have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

In their Counterclaim, defendants allege only that Springbrook's software products did not function as Springbrook said they would. Defendants allege no acts by Springbrook during its performance of the Agreement that might be described as careless or neglectful. In fact, the various communications between defendants and Springbrook presently in the record show that Springbrook attended diligently to its obligations under the Agreement and stood ready to work with defendants to solve the difficulties they were encountering with the software.

Simply put, this court sees no evidence in the existing record from which a jury could infer that Springbrook violated its duty of good faith and fair dealing. It would be improper to dismiss this claim, however, without providing defendants the opportunity to be heard. Accordingly, not later than May 27, 2015, defendants should inform the court whether they still intend to litigate this claim, and if so, what evidence they will introduce at trial to establish it. Springbrook may file a response to defendants' submission not later than June 5, 2015.

Meanwhile, given this claim's bleak prospects, the court will strike the other dates remaining on the calendar, including the trial date. If it appears from the parties' submissions that this claim is viable, then the court will reschedule a date for trial in consultation with the parties.

## V. Damages

Springbrook asks the court to enter judgment against defendants in the amount of $197,465.85 plus interest for unpaid invoices. Springbrook has supported its request with copies of unpaid invoices and letters sent to defendants notifying them of their amounts past due. Although defendants have not disputed the invoices, by the court's tally, the invoices total

only $157,806.41, leaving approximately $40,000 of Springbrook's damages request unaccounted for.

This court is not prepared to award Springbrook the full amount it seeks based on the current evidentiary record. Therefore, unless defendants stipulate to the amount of damages owed, Springbrook must submit documentary support, with foundational affidavits that establish that the additional $40,000 it seeks are due and owing by one or both defendants. Copies of letters notifying defendants that certain amounts were owed will not suffice. Additionally, Springbrook should make clear against whom judgment should be entered. Although it appears that most of the unpaid invoices are for products and services supplied to the City, the parties agree that Douglas County is responsible for any payment default of the City of Superior. In their supplemental submissions, Springbrook should make clear from whom it is seeking damages and in what amounts.

Springbrook's supplemental materials on damages are due on the same date as defendants' response to the order to show cause, May 27, 2015, with responsive briefing by defendants due on June 5, 2015. If there appears to be a triable question as to damages, then the court will hold a telephone conference to schedule the matter for a trial on damages.

ORDER

IT IS ORDERED THAT:

1.  The motion of plaintiff Springbrook Software, Inc. for summary judgment, dkt.
    50, is GRANTED in part and DENIED IN PART:

    (a)  It is DENIED as to defendants' counterclaim for breach of
         the covenant of good faith and fair dealing.

    (b)  It is GRANTED in all other respects.

2.  The remainder of the scheduling, including the trial date, is STRICKEN.

3.  Not later than May 27, 2015, defendants shall SHOW CAUSE why this court
    should not dismiss their claim of breach of the covenant of good faith and
    dealing.  Plaintiff's response in opposition is due not later than June 5, 2015.

4.  Not later than May 27, 2015, plaintiff shall submit additional evidentiary
    support for its request that the court award it $197,465.85. Defendants' response
    in opposition is due not later than June 5, 2015.

Entered this 13th day of May, 2015.

> BY THE COURT:
>
> /s/
>
> STEPHEN L. CROCKER
> Magistrate Judge

38